UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America       :
                               :
     v.                        :       File No. 1:02-CR-25-1
                               :
Darrell Laflam                 :

<u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>
(Papers 88 and 97)

Defendant Darrell Laflam, proceeding *pro se* and *in forma pauperis*, has filed a motion to vacate, set aside, or correct his sentence pursuant to the provisions of 28 U.S.C. § 2255.  On February 28, 2003, a jury convicted Laflam on two counts of bank robbery, two counts of armed bank robbery, and one count of attempted witness tampering.  In his § 2255 motion, Laflam claims that his convictions for both armed and unarmed robbery constituted double jeopardy, that his attorney was ineffective, and that his sentence violated the Supreme Court's recent holding in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004).  The government agrees that Laflam should not have been sentenced for both bank robbery and armed bank robbery.  The government opposes the remainder of Laflam's motion.  For the reasons set forth below, I recommend that Laflam's motion be GRANTED in part and DENIED in part, and that Laflam's convictions for simple

bank robbery be vacated.  I also recommend that Laflam's pending motion for an evidentiary hearing be DENIED.

<u>Factual Background</u>

On November 16, 2001, Laflam allegedly entered a Charter One Bank in Proctor, Vermont wearing a mask and a plaid jacket with a red hood.  Laflam approached a teller in the bank, pointed a BB gun at her, and demanded money. When the teller became immediately upset, Laflam handed a brown paper bag to a second teller and instructed her to fill it with money.  Laflam then took the bag, made a threat about a bomb, and ran out of the bank.

Immediately after this first robbery, Laflam allegedly told his girlfriend, Danielle McCullough, that he had just robbed a bank.  McCullough then witnessed Laflam separating the stolen cash into two piles, one for covering debts and the other for spending.  Laflam's debts included back rent and drug debts.  The government submitted evidence at trial that Laflam and McCullough had a cocaine habit that cost Laflam almost $600 a week. (Trial Tr., 2/25/03, at 112-13).

On November 20, 2001, police recovered the plaid jacket and the mask used in the robbery.  Both pieces of

evidence were sent to the FBI laboratory for analysis. (Trial Tr., 2/27/04, at 48).

In mid-December, Laflam began to plan a second robbery with the assistance of his friend, Wayne Curavoo, and McCullough. Although Curavoo was arrested shortly before the planned heist, Laflam and McCullough proceeded to rob a Charter One Bank in West Pawlet, Vermont on December 31, 2001. During the robbery, Laflam wore a mask and a hooded sweatshirt with the logo "Zero Gravity" on the back. (Trial Tr., 2/25/03, at 127-28).

Similar to the first robbery, Laflam entered the bank, pointed a fake gun at the tellers, and ordered them to give him money. After receiving the money, Laflam threatened that a bomb would soon go off, and ran out the front to door to a car in which McCullough was waiting. As the two drove away from the scene, Laflam threw the fake gun, mask, and sweatshirt out of the car. (Trial Tr., 2/26/03, at 129-30). Soon thereafter, police recovered the Zero Gravity sweatshirt and sent it to the FBI laboratory for analysis. (Trial Tr., 2/27/03, at 48).

At trial, a government witness testified that each

of the three pieces of clothing sent to the FBI for testing contained hairs similar to Laflam's.  Dyed hairs from the Zero Gravity sweatshirt were also similar to McCullough's hair.  A second witness testified that mitochondrial DNA from the red plaid jacket and the mask used in the Proctor robbery linked Laflam to that crime, but excluded him as the source of the hair from the Zero Gravity sweatshirt.  (Trial Tr., 2/27/03, at 118-121).  Finally, a third witness testified that she had performed nuclear DNA tests on the evidence, and found a "strong match" between Laflam's DNA and that found on the Proctor mask and jacket.  Those tests also linked McCollough to the Zero Gravity sweatshirt.  (Trial Tr., 2/27/03, at 203-05).

McCullough and Curavoo both agreed to cooperate with investigators.  Curavoo not only knew of the second robbery, but had also discussed the first robbery in detail with Laflam.  (Trial Tr., 2/26/03, at 140-41).  In addition to providing information about both robberies, McCullough revealed Laflam's attempts to stop her from cooperating with the government.  Specifically, Laflam had sent McCullough letters, both directly and through a

friend, urging her to change her story and to supply false information.  (Trial Tr., 2/27/03, at 15-16); (Trial Tr., 2/26/03, at 124-25).

Laflam also made calls from prison to his mother and sister, urging his family to speak with McCullough about her cooperation, with specific instructions about what McCullough should say if questioned by law enforcement officials.  Laflam also tried to have his mother and friends support various alibi's.  These conversations were recorded by prison personnel.

Laflam was ultimately convicted on two counts of bank robbery, two counts of armed bank robbery, and one count of attempted witness tampering.  At sentencing, the Court determined that Laflam was a career offender, with a resulting imprisonment range of 262-327 months.  The Court then sentenced Laflam to concurrent 290 month terms on the two armed robbery counts, concurrent 240 month terms on the two counts of unarmed robbery, and a concurrent 120 month term on the witness tampering count. (Paper 79).  The Court also ordered a 5-year period of supervised release, over $10,000 in restitution, and a special assessment of $100 for each count.  Id.

Laflam appealed his conviction and sentence,
offering three arguments on appeal.  Laflam first argued
that the Court should not have allowed testimony
pertaining to his involvement with cocaine.  Second,
Laflam argued that the Court should not have admitted
statements made by his mother.  Third, Laflam asserted
that the Court should not have denied his motion for
acquittal on the charge of witness tampering.  Laflam did
not challenge his sentence on appeal.  The Second Circuit
affirmed his conviction, issuing its mandate on June 15,
2004.

## Discussion

Section 2255 is intended to remedy fundamental
defects in a criminal prosecution.  See United States v.
Addonizio, 442 U.S. 178, 185 (1979).  A court may grant
relief under § 2255 only for constitutional errors, lack
of jurisdiction or an error of law constituting a
fundamental defect which inherently results in a complete
miscarriage of justice.  See Graziano v. United States,
83 F.3d 587, 590 (2d Cir. 1996).  The Supreme Court has
defined a miscarriage of justice as a claim of actual
innocence.  See United States v. Olano, 507 U.S. 725, 736

6

(1993).  Absent exceptional circumstances such as a
miscarriage of justice, nonconstitutional or
nonjurisdictional questions are generally foreclosed to a
§ 2255 petitioner if not raised on direct appeal unless
the petitioner can show cause for and prejudice from his
failure to raise the issue on appeal.  See Brennan v.
United States, 867 F.2d 111, 120 (2d Cir. 1989).
Ineffective assistance of counsel claims are, however,
generally excepted from this cause and prejudice
requirement and may be brought for the first time in a §
2255 motion.  See Massaro v. United States, 538 U.S. 500,
504 (2003).

I.   Double Jeopardy

     Laflam's first claim is that he was "punished four
times for two bank robberies in violation of the Fifth
Amendment Double Jeopardy Clause."  (Paper 88 at 13).  As
noted above, the government agrees that bank robbery is a
lesser included offense to armed bank robbery, and that
Laflam should not have been sentenced on the lesser
included charge.[1]  (Paper 95 at 11); see United States v.

---

     [1]  The Court notes that the double jeopardy claim was
not raised on direct appeal.  In the usual case, the
Court would review this claim under the cause and
prejudice standard noted above.  See Riascos-Prado v.

Beckett, 208 F.3d 140, 149 (3d Cir. 2000).  In Beckett, as in this case, the defendant was convicted of robbing two separate banks, and was sentenced on two counts of bank robbery and two counts of armed bank robbery.  208 F.3d at 149.  The Third Circuit vacated the sentences on the bank robbery counts, concluding that "[t]he concurrent sentences imposed on Counts One and Three for the lesser included offenses of bank robbery violated the Double Jeopardy Clause."  Id. (citing Gov't of Virgin Islands v. Dowling, 633 F.2d 660, 668 (3d Cir.), cert. denied, 449 U.S. 960 (1980)).

While the parties agree that there was a double jeopardy violation, Laflam argues that it is the armed bank robbery counts that should be vacated.  His reasoning here is that the jury found him guilty on counts 1 and 3 for bank robbery, and because these counts preceded the armed robbery counts (counts 2 and 4) in the

_____

United States, 66 F.3d 30, 34 (2d Cir. 1995).  Here, however, the government has not raised the issue of procedural default, and has conceded that the bank robbery convictions should be vacated.  In light of the government's position, the Court will not undertake the cause and prejudice analysis in this case.  Cf. Fermin v. United States, 2000 WL 12133, at *4 (S.D.N.Y. Jan. 6, 2000) (court granted relief on double jeopardy claim despite statutory time bar in light of government's consent to granting such relief).

jury instructions, the jury found him guilty of bank robbery before it found him guilty of armed bank robbery. Thus, Laflam argues, it was the armed robbery counts that constituted double jeopardy.  (Paper 88 at 14).  This reasoning has been squarely rejected by the U.S. Supreme Court.  See Ohio v. Johnson, 467 U.S. 493, 501 (1984).

> Respondent's argument is apparently based on the assumption that trial proceedings, like amoebae, are capable of being infinitely subdivided, so that a determination of guilt and punishment on one count of a multicount indictment immediately raises a double jeopardy bar to continued prosecution on any remaining counts that are greater or lesser included offenses of the charge just concluded.  We have never held that, and decline to hold it now.

Id.; see also Morris v. Reynolds, 264 F.3d 38, 49-50 (2d Cir. 2001).  Accordingly, as the Third Circuit did in Beckett, this Court should vacate any convictions imposed for the lesser included offense of bank robbery.  See Grimes v. United States, 607 F.2d 6, 14-15 (2d Cir. 1979) (bank robbery convictions merged into armed bank robbery convictions).

II.  Court's Alleged Denial of Constitutional Rights

Laflam next claims that Judge Murtha prejudiced his ability to complain about his court-appointed counsel. The Court initially appointed Beth Mann of the Federal

9

Public Defender's Office to represent Laflam.  Mann
subsequently reported to the Court that she and her
client were having communication difficulties, and that
she did not believe she could adequately represent him.
Laflam requested new counsel, and Judge Murtha appointed
Kerry DeWolfe, Esq.

In appointing DeWolfe, Judge Murtha informed Laflam
that  "this is it.  You get one more chance.  If you
don't cooperate with this lawyer, then you will either
try the case yourself or you'll stick with the lawyer."
(Hearing Tr., 7/15/02, at 7).  Laflam claims that Judge
Murtha's warning left him with the choice of either
trying the case himself, or tolerating ineffective
assistance.  "The petitioner was severely prejudiced by
his counsel's incompetency's [sic] . . . .  If it had not
been for the Judges [sic] ruling, the petitioner would
have requested new counsel."  Id.  Laflam claims that by
urging him to communicate constructively with counsel,
Judge Murtha violated his Fifth, Sixth and Fourteenth
Amendment rights to due process, equal protection and
fundamental fairness.  Id.

If a criminal defendant is the primary reason for

communication breakdowns with counsel, it is within the discretion of the district court to deny further appointments of counsel.  See United States v. John Doe No. 1, 272 F.3d 116, 124 (2d Cir. 2001).  Here, Judge Murtha based the right to further court-appointed counsel upon Laflam's ability to cooperate with his current attorney.  Judge Murtha did not say that Laflam had no right to further counsel, or that Laflam had to tolerate ineffective assistance of counsel.  Under the law of this Circuit, Judge Murtha's alleged warning that no further counsel would be provided if there were continued communication breakdowns was well with the Court's discretion.  Id.  Because Judge Murtha's alleged statements were legally supported and appropriate, and did not deny Laflam his constitutional rights, no relief should be provided on this ground.

III.  *Blakely* Claim

    Laflam's third claim is that his sentence was enhanced in violation of the Supreme Court's holding in Blakely v. Washington, 124 S. Ct. 2531 (2004).  Laflam contends that Blakely may be applied in his case because the rule in Blakely "came forth after the petitioner was

sentenced but before his conviction became final."
(Paper 88 at 16).  For purposes of a § 2255 petition, a
criminal conviction that has been appealed becomes final
when the Supreme Court "affirms a conviction on the
merits on direct review or denies a petition for a writ
of certiorari, or when the time for filing a certiorari
petition expires."  Clay v. United States, 537 U.S. 522,
527 (2003).  Laflam's petition for writ of certiorari was
denied by the Supreme Court on October 18, 2004.
See Laflam v. United States, 125 S. Ct. 363 (2004).
Blakely was decided on June 24, 2004.  Therefore, Laflam
correctly claims that his conviction became final after
the Supreme Court's decision in Blakely.  See Sup. Ct. R.
13.

      Nonetheless, the rule of law cited by Laflam and
discussed in the Blakely decision was not made applicable
to the Federal Sentencing Guidelines until the Supreme
Court's subsequent decision in United States v. Booker,
125 S. Ct. 738 (2005).  See Blakely, 124 S. Ct. at 2538
n.1 ("The Federal Guidelines are not before us, and we
express no opinion on them.").  Moreover, "the result in
Booker was not dictated" by the Blakely decision, and the

Second Circuit has concluded that even with existence of Blakely, Booker announced a new rule of law. Guzman v. United States, 404 F.3d 139, 142 (2d Cir. 2005). Thus, it is Booker, and not Blakely, that might provide Laflam with the relief he seeks. That relief will only be available, however, if Booker may be applied retroactively.

In Guzman, the Second Circuit held that Booker does not apply retroactively to cases on collateral review that became final prior to the Booker decision. Id. at 144. Specifically, the Guzman court determined that although Booker established a new rule of constitutional law, the rule was procedural rather than substantive. Id. at 141-42. Guzman further held that the rule announced in Booker did not establish a "watershed rule 'implicating the fundamental fairness and accuracy of the criminal proceedings,'" and thus could not be applied retroactively. Id. at 142-43 (quoting Schriro v. Summerlin, 124 S. Ct. 2519, 2523 (2004)). Consequently, the law in this Circuit is that Booker is not retroactive, "i.e., it does not apply to cases on collateral review where the defendant's conviction was

13

final as of January 12, 2005, the date that <u>Booker</u> was
issued." <u>Id.</u> at 144.  Because Laflam's conviction was
final prior to that date, his claim of a Sixth Amendment
violation should be DENIED.

IV.  <u>Ineffective Assistance of Counsel</u>

Laflam's final set of claims allege that his
attorney was constitutionally ineffective at trial and on
appeal.  "[T]he proper standard for attorney performance
is that of reasonably effective assistance." <u>Strickland
v. Washington</u>, 466 U.S. 668, 687 (1984).  The essence of
an ineffective assistance claim is that counsel's
unprofessional errors so upset the adversarial balance
between defense and prosecution that the trial was
rendered unfair and the verdict rendered suspect.  <u>See
Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986).  Thus, a
defendant must establish (1) that counsel made errors so
serious that he was deprived of reasonably competent
representation and (2) that counsel's deficient
performance prejudiced the defense.  <u>See</u> <u>Hernandez v.
United States</u>, 202 F.3d 486, 488 (2d Cir. 2000) (citing
<u>Strickland</u>, 466 U.S. at 687-691).

To satisfy the first prong, the petitioner must show

14

that counsel's representation fell below an objective standard of reasonableness.  More specifically, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and the deficient performance so undermined the proper functioning of the adversary process that the trial cannot be relied upon as having produced a just result."  Strickland, 466 U.S. at 687; see also United States v. DiTommaso, 817 F.2d 201, 215 (2d Cir. 1987).  In conducting the ineffective assistance inquiry, a court must maintain a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  See Strickland, 466 U.S. at 689.  The court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  See id. at 690.  In evaluating counsel's performance, the court is to look to "an objective standard of reasonableness . . . under prevailing professional norms" and apply this standard in light of all the circumstances in the case.  Id. at 688, 690.

15

In evaluating the prejudice component of Strickland, a court must determine whether, absent counsel's error, it is reasonably probable that the outcome of the proceeding would have been different. See Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994). A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 703.

A. Failure to Object to Multiplicity of Indictment

Laflam's first ineffective assistance claim is that his attorney failed to timely object to the "improperly multiplicious" indictment. (Paper 88 at 17). As set forth above, Laflam should not have been sentenced for both bank robbery and armed bank robbery. Nonetheless, the indictment properly included both sets of charges. See Grimes, 607 F.2d at 15 n.8. As the Second Circuit noted in Grimes,

> [s]uspected armed bank robbers may be indicted in one count for bank robbery and in another count for armed bank robbery. After trial and a verdict of guilty on the armed bank robbery count, the bank robbery count would then be merged into the armed bank robbery count. Only one judgment of conviction would be entered.

Id. Furthermore, because I am recommending vacation of the bank robbery convictions, Laflam is already receiving

16

adequate relief on this claim.

B.  Failure to Investigate Employment

Laflam's next claim is that his attorney failed to properly investigate his employment.  Laflam claims that the failure to introduce evidence of his employment during the first bank robbery harmed his case, as this evidence allegedly would have shown that he was not in need of money at the time, and that purchases made immediately after the robbery could be explained.  (Paper 88 at 19-20).  Instead, Laflam argues, the government was able to argue that Laflam was an "'unemployed desperate man in financial need," and that cash spent within days of the robbery "'was as good as finding money on this defendant right after the robberies.'"  Id.

The government argues that Laflam can show no prejudice resulting from his attorney's alleged failure to investigate and present his employment status.  Laflam has not offered any evidence of the nature of his alleged employment, or of the wages he was allegedly earning.  According to the government, the pre-sentence investigation report ("PSR") stated that Laflam was employed between October and November, 2001, earning $7.50 per hour.  After that time, he was employed only in

18

odd jobs.  The PSR also stated that Laflam's 2001 tax return showed income under $8,000.  In the face of evidence showing an expensive drug habit and a failure to pay rent, this wage and employment evidence, had it been presented to the jury, would have had little impact on the government's assertion that Laflam was in financial need.[2]

Furthermore, other evidence of Laflam's guilt was substantial.  Two witnesses, McCullough and Curavoo, testified that Laflam had admitted to the first robbery. McCullough admitted to driving the getaway car in the second robbery.  DNA evidence and taped prison conversations bolstered the government's already-strong case.  Accordingly, Laflam has not shown a reasonable probability that his attorney's alleged failure to investigate his employment status prejudiced the outcome of his trial.

C.  Failure to Challenge Sentence

Laflam also contends that his attorney failed to properly challenge the use of a 1994 Vermont drug conviction in the calculation of his federal sentence.

---

[2]  Laflam does not contest the accuracy of this portion of the PSR.  (Paper 96 at 2-3).

Laflam's specific claim is that his state conviction for "cultivating <u>four</u> marijuana plants" should not have qualified as the manufacture of a controlled substance under § 4B1.2(b) of the Sentencing Guidelines.  (Paper 88 at 20) (emphasis in original).  Section 4B1.2(b) defines a controlled substance offense "an offense under . . . state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture . . . of a controlled substance."

Laflam's first argument on this point is that <u>United States v. Casarez-Bravo</u>, 181 F.3d 1074, 1077 (9th Cir. 1999) prohibits the use of a prior state offense as a predicate offense under the Sentencing Guidelines where the state statute and judicially noticeable facts "would allow the defendant to be convicted of an offense other than that defined as a qualifying offense by the guidelines."  Laflam contends that because the relevant Vermont statute, 18 V.S.A. § 4230, pertains to both possession and cultivation, he could have been convicted of an offense that does not qualify as "manufacture" under § 4B1.2(b).

In <u>Casarez-Bravo</u>, the state court statute was

broader than the definition of a controlled substance offense under § 4B1.2(b).  181 F.3d at 1077-78.  The court also noted that the government had failed to offer judicially noticeable facts to show that the state court convictions qualified as predicate offenses under the Guidelines.  Id. at 1078.  Here, the PSR specifically stated that Laflam was convicted of cultivation, and not mere possession.  Moreover, the PSR described the factual allegations in the affidavit attached to the state court information, which confirm that Laflam was involved in cultivation.  Laflam himself describes his activity as growing four marijuana plants.  (Paper 88, at 22).  Given these facts, Casarez-Bravo is distinguishable, as the Vermont state court's conviction was clearly based upon Laflam's cultivation, rather than merely his possession, of marijuana.

Laflam's second argument on the sentencing issue is that federal law does not criminalize the cultivation of four marijuana plants.  In response, the government notes that 21 U.S.C. § 841(a)(1) makes it a crime to manufacture a controlled substance, including marijuana, and that 21 U.S.C. § 841(b)(1)(D) criminalizes the

manufacture of up to 50 plants.  Because growing
operations have been considered "manufacturing" under
these drug laws, Laflam's argument is without merit.
See, e.g., United States v. Bernitt, 392 F.3d 873, 879
(7th Cir. 2004).

Laflam's third argument with respect to the use of
his state court conviction as a predicate offense is that
the evidence of his cultivation would not have supported
a federal law conviction.  Laflams contends that his
attorney should have presented this fact at sentencing.
His argument is misplaced.  The relevant fact with
respect to Laflam's state court conviction is simply that
he was convicted.  Any challenge to the facts underlying
that conviction, which was based upon a plea of guilty,
will not be considered here.  Because his state court
conviction for marijuana cultivation qualified as a
predicate offense under the Sentencing Guidelines,
Laflam's challenges to his sentence should be DENIED.

D.  Failure to Exclude Hair Analysis

Laflams next claims that counsel failed to object to
the government's admission of microscopic hair analysis,
despite the fact that she had assured him a motion in

opposition would be filed.  He also contends that the
evidence in question would have been excluded under
Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S.
579 (1993).  Again, the government argues lack of
prejudice.

In general, "the principles and procedures
underlying hair and fiber evidence are overwhelmingly
accepted and reliable."  United States v. Santiago
Santiago, 156 F. Supp. 2d 145, 152 (D.P.R. 2001).  "As
one treatise notes, '[t]he cases in which courts have
excluded hair evidence are so rare that they have
literally amounted to only a handful of precedents . . .
.  In contrast to the few cases excluding hair evidence,
a large body of case law reflects the courts' receptivity
to hair analysis."  Id. (quoting Giannelli & E.
Imwinkelried, Scientific Evidence §§ 24-3, at 360-61).
Here, Laflam has failed to provide any support for the
argument that his case would have been one of the "rare"
instances in which a Court excludes testimony with
respect to hair analysis.  Furthermore, as noted above,
the evidence of Laflam's guilt notwithstanding the hair
evidence was substantial.  Accordingly, the Court should

conclude that Laflam has again failed show prejudice resulting from his attorney's alleged failure to exclude the government's hair analysis evidence.

E.  Failure to Exclude DNA Evidence

On a similar point, Laflam argues that his attorney failed to oppose the admission of DNA evidence.  In this claim, Laflams contends that his attorney identified an expert to counter the admissibility and credibility of the government's evidence, and once again promised to file a motion to exclude it.  No such motion was ever filed, and Laflams argues that "the government's motion to admit DNA evidence was granted for lack of opposition."  (Paper 88 at 25).

Once again, Laflams has failed to show that a motion to exclude the DNA evidence would have been likely to succeed.  Moreover, the record shows that rather than oppose the government's DNA evidence in a motion, defense counsel presented the expert as a witness at trial. (Trial Tr., 2/28/03, at 5-77).  In lengthy testimony, this expert critiqued the reliability of the government's test results.  Id.  While Laflams argues that based upon this expert's conclusions, the DNA evidence should have

been excluded under Fed. R. Evid. 403 and 702, as well as
for lack of credibility and failure to meet "the
scientific requirement," there is nothing in the record
to support these conclusions.  (Paper 88 at 25).  In
general, DNA evidence has long been admissible in the
courts of this Circuit.  See United States v. Jakobetz,
955 F.2d 786, 799 (2d Cir. 1992).  Furthermore, there is
little indication that absent this evidence, there is a
reasonable probability that the outcome at trial would
have been different.  Consequently, this claim should
also be DENIED.

     F.  Failure to Object to Jury Instructions

     Laflam's next ineffective assistance claim is that
his attorney failed to object to the Court's instructions
on the bank robbery and armed bank robbery counts.
Laflam's contention here is again based upon his double
jeopardy challenge, as he argues that providing
instructions for both offenses violated his
constitutional rights.  As set forth above, the
government properly charged Laflams with both bank
robbery and armed bank robbery.  Thus, those counts were
presented to the jury, and only after the jury found

Laflams guilty on all four counts should the convictions have merged.  See Grimes, 607 F.2d at 15 n.8.  Laflam's claim of erroneous instructions is, therefore, without merit.

G.  Failure to Exclude Statements of Mother

Laflams further claims that his attorney failed to properly object, both in writing and orally, to the admission of recorded statements by his mother.  He alleges that counsel admitted to not having fully briefed the issue, and that she failed to provide the court with relevant case law.  At trial, the government argued that the mother's statements were admissible under the co-conspirator exception to the hearsay rule.  (Trial Tr., 2/26/03, at 14).  Defense counsel objected and argued that additional research needed to be done on the issue.  Id. at 29-31.  The Court allowed her to contact her law office and request that such research be performed while the trial was proceeding.  Id. at 30-31.  The Court also performed its own research.  Id. at 99.  Judge Murtha ultimately concluded that the law in this Circuit supported the government's position.  Id.

Laflams has not shown that the Court's admission of

his mother's statements was erroneous.  His principal argument is that without independent corroboration of a conspiracy, the statements of a co-conspirator alone are not admissible under the cited exception to the hearsay rule.  (Paper 88 at 28, citing Fed. R. Evid. 801(d)(2)(E)).  Indeed, the law in this Circuit is that in order for hearsay from a co-conspirator to be admitted, there must be some corroborating evidence of the defendant's participation in the conspiracy.  See United States v. Tellier, 83 F.3d 578, 580-81 (2d Cir. 1996).  Judge Murtha found that if a conspiracy existed, Laflam's own statements to his mother, urging her to reach out to McCullough, provided such corroboration. (Trial Tr., 2/23/03, at 100).

Laflams has cited several cases reiterating the independent corroboration rule, none of which suggest that Judge Murtha's conclusion about Laflam's own statements was erroneous.  (Paper 88 at 28-29).  While by her own admission, defense counsel might have briefed this issue in greater detail, she posed a timely objection and, according to the government, raised the issue without success on appeal.  In light of these

27

multiple, and unsuccessful objections, and absent any showing that the Court's admission of the mother's statements were erroneous, the Court should not find that counsel was constitutionally ineffective.

H.   Double Hearsay Instruction

Laflam's final claim is that his attorney failed to object when the Court did not give a promised instruction with respect to double hearsay.  The claim is without merit, as Judge Murtha provided this instruction on the third day of trial.  (Trial Tr., 2/27/03, at 90-93).

## Conclusion

For the reasons set forth above, I recommend that Laflam's motion to vacate, set aside, or correct his sentence (Paper 88), filed pursuant to the provisions of 28 U.S.C. § 2255, be GRANTED in part and DENIED in part. Specifically, I recommend that the Court vacate Laflam's convictions for bank robbery, and leave intact the convictions for armed bank robbery and attempted witness tampering.  The Court should also adjust the special assessment to reflect a conviction on only three counts instead of five.  In light of this recommendation, I further recommend that Laflam's motion for an evidentiary

28

hearing be DENIED.

Dated at Burlington, in the District of Vermont,
this 20th day of June, 2005.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

Any party may object to this Report and Recommendation
within 10 days after service by filing with the clerk of
the court and serving on the magistrate judge and all
parties, written objections which shall specifically
identify the portions of the proposed findings,
recommendations or report to which objection is made and
the basis for such objections.  Failure to file
objections within the specified time waives the right to
appeal the District Court's order.  See Local Rules 72.1,
72.3, 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b),
6(a) and 6(e).